UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUN 2 4 2026

ARTHUR JOHNSTON
BY          DEPUTY

| | |
|---|---|
| OFFICE OF STATE PUBLIC DEFENDER; ANDRÉ DE GRUY; and JENNIFER MORGAN, BRENDA LOCKE, and A. ARMAN MIRI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KATHARINE SURKIN, DIRECTOR OF THE ADMINISTRATIVE OFFICE OF COURTS, in her official capacity,<br><br>Defendant. | Case No.: *3:26cv458-HTW-LGI* |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.    Through this lawsuit, the Mississippi Office of State Public Defender and its leaders seek immediate, emergency relief against Katharine Surkin, Director of the Administrative Office of Courts (hereafter, "AOC" or "Defendant") to prevent the enforcement of subsection (24) of Miss. Code Ann. § 43-21-261 (West 2026), which will go into effect automatically on July 1, 2026. Absent an injunction, AOC will cease providing records related to Youth Court cases to *anyone*, including all Youth Court attorneys and their clients, in violation of basic principles of due process. As the Commissioner for Mississippi's Department of Child Protective Services ("CPS") recently recognized, if the provision goes into effect, all Youth Court proceedings "would grind to a halt."[1]

2.    AOC's current policies and practices relating to access to records also violate Plaintiffs' constitutional rights and the rights of all parents and children with Youth Court cases.

---

[1] Exhibit 1, Letter from Andrea A. Sanders, Comm'r of Miss. Dep't of Child Protective Servs., to Miss. Governor Tate Reeves (April 30, 2026) ("Ltr. from A. Sanders to T. Reeves").

To remedy this, Plaintiffs also seek a permanent injunction requiring Defendant to provide Youth Court attorneys and their clients with access to all case records in its control.

3. In Mississippi, the Judges, Chancellors, and referees (together, "judicial officers") who preside over Youth Court matters wield some of the most profound power in the entire legal system: they end children's legal relationships with their parents, siblings, and grandparents; rearrange entire families; and confine children to jail cells.[2]

4. Most legal cases filed in the state of Mississippi are heard in open courtrooms, and related records are generally accessible to litigants, parties, and the public.

5. But in Mississippi Youth Court, judicial officers make life-changing decisions behind closed doors, and even parents, children, and their lawyers are routinely barred from accessing records and information about their own cases. This is in part because Mississippi law makes case files and records for Youth Court proceedings confidential, Miss. Code Ann. §§ 43-21-251– 43-21-265,[3] subject only to certain exceptions that are set out in Miss. Code Ann. § 43-21-261.

6. When litigants and their attorneys do manage to obtain access to records or information, social workers, prosecutors, probation officers, and even judges themselves threaten parents and children with criminal prosecution if they talk about anything happening in Youth Court or criticize the government officials involved in their cases. Knowing the judicial

---

[2] All three types of judicial officers have the same authority when presiding over a Youth Court case, except that referees' orders can be appealed to a Chancellor.

[3] E.g., Miss. Code Ann. § 43-21-251(2) (West 2026) ("The records of the youth court and the contents thereof shall be kept confidential and not disclosed except as provided in Section 43-21-261."); Miss. Code Ann. § 43-21-255(1) ("Except as otherwise provided by this section, all records involving children made and retained by law enforcement officers and agencies or by the youth court prosecutor and the contents thereof shall be kept confidential and shall not be disclosed except as provided in Section 43-21-261."); Miss. Code Ann. § 43-21-257(1) ("Unless otherwise provided in this section, any record involving children . . . and the contents thereof maintained by the Department of Human Services or the Department of Child Protective Services, or any other state agency, shall be kept confidential and shall not be disclosed except as provided in Section 43-21-261."); Miss. Code Ann. § 43-21-259 ("All other records involving children and the contents thereof shall be kept confidential and shall not be disclosed except as provided in section 43-21-261.").

2

officers' practices, attorneys for parents and children typically counsel their clients not to say anything to anyone about their cases, or even that they are involved in Youth Court.

7.      Lack of timely and uniform access to Youth Court records renders the entire Youth Court system, as it exists today, fundamentally unfair: it is impossible to get a fair hearing or for counsel to do their job if Plaintiffs—who are attorneys representing indigent parents and children in Youth Court—and their clients cannot readily access charging documents, discovery, or court orders. Judicial officers cannot make accurate decisions about fundamental liberty interests— such as freedom from incarceration and the right to family integrity—when key parties to a case do not have access to the information the government says justifies the infringements or a fair opportunity to test the veracity of the state's allegations. The system's draconian policies and practices relating to confidentiality result in the unnecessary separation of families and the unnecessary detention of children, infringe children's and parents' rights to counsel and due process, and impede Plaintiffs' ability to represent their clients.

8.      The system harms children and families as is. Recognizing this, Andrea Sanders, the Commissioner of the Mississippi Department of Child Protective Services, recently pleaded for greater transparency, stating: "There's been a myth propagated that because this is about children and the very sensitive details of their lives that we must seal it[.] . . . My plea to the state is: Let's have transparency in the courtroom."[4]

9.      But Mississippi is moving in the opposite direction. On July 1, 2026, secrecy in Youth Court will become even more extreme.

10.      On July 1, the exceptions in § 261 will be automatically repealed, meaning that there will be *no exceptions* to the confidentiality provisions in Chapter 21. *See* Miss. Code Ann. § 43-21-261(24) ("The provisions of this section shall stand repealed on July 1, 2026.").

---

[4] Anna Wolfe, *Might Mississippi's Long-Closed Youth Court System Receive Sunshine?*, MISSISSIPPI TODAY (Mar..16, 2026), https://mississippitoday.org/2026/03/16/mississippis-long-closed-youth-court/.

11.    As a result of § 43-21-261(24), beginning on July 1, 2026, parents and children involved in Youth Court will no longer be permitted *any* access to their case files, including, for example, court orders telling parents what they must do to reunite with their children, or telling children what court-ordered conditions they must comply with in a delinquency case. Parents whose children are involved in delinquency proceedings will not be permitted to view their children's case files. Attorneys representing children in delinquency proceedings or parents in termination trials will no longer be permitted to access any discovery or information about the allegations against their clients.

12.    These unconstitutional denials of access are already routine practice in many Youth Court cases around the state, and on July 1, 2026, they will become mandatory and uniform.

13.    Subsection (24) will have other negative consequences. If the provision goes into effect, CPS will no longer be permitted to share information with the doctors, schools, and caregivers who serve children in state custody, impeding children's education and medical care. Chancellors and referees—who preside over many Youth Court cases around the state—may even be barred from viewing files. And the state may not be able to demonstrate compliance with federal child welfare regulations, which could jeopardize Mississippi's funding for the foster system.

14.    In May 2026, Sanders asked Governor Tate Reeves to call a Special Session of the Legislature to amend the statute and prevent § 261(24) from going into effect, explaining that the subsection would have catastrophic effects on children, families, and the entire Youth Court system.[5]

15.    To date, the Governor has failed to call a Special Session to consider § 261.

16.    The Mississippi Supreme Court has failed to act.

---

[5] Ex. 1, Ltr. from A. Sanders to T. Reeves; Anna Wolfe, *Youth Court Confidentiality Should Be Included in Special Session, Officials Urge Governor*, MISSISSIPPI TODAY (May 12, 2026), https://mississippitoday.org/2026/05/12/youth-court-confidentiality-special-session/.

17. Youth Court judicial officers around the state have no plan to forestall the catastrophe, even in their own courts.

18. Despite officials' acknowledgment, both publicly and privately, that subsection 24 is a ticking time bomb, no one at the state or local level has taken definitive action.

19. As a result, beginning July 1, the state of Mississippi will be free to separate families based on allegations of abuse and neglect, terminate children's legal relationships with their parents, and arrest and jail children, but those children and families will have no way to meaningfully challenge the government's actions, even with the assistance of counsel.

20. The automatic repeal of the exceptions set forth in § 261 will take the troubling and patchwork secrecy of the Mississippi Youth Court system to an entirely new and unprecedented extreme.

21. The Office of the State Public Defender and the Office's Youth Court leadership— André de Gruy, the State Public Defender; Jennifer Morgan, Family Defense Program Director; and Brenda Locke, Youth Defense Program Director—along with A. Arman Miri, who represents indigent clients in Youth Court, bring this lawsuit to prevent this devastating result and to ensure uniform and timely access to Youth Court records for Youth Court attorneys and their clients going forward, as required by due process.

## II. JURISDICTION AND VENUE

22. This is a civil rights action arising under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). The Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 of 65 of the Federal Rules of Civil Procedure. This Court has authority to award attorneys' fees and costs under 42 U.S.C. § 1988.

23. Venue is properly set within the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1391 because Defendant Katharine Surkin is employed in and operates as Director of the Administrative Office of the Courts in Hinds County,

where a substantial part of the events giving rise to the claims herein occurred. Hinds County is in the Southern District of Mississippi, specifically, the Northern Division.

### III.    PARTIES

24.    Plaintiff Mississippi Office of State Public Defender ("OSPD") was established in 2011 to consolidate the existing Capital Defense Counsel Office, Office of Indigent Appeals, and Division of Defender Training, and to develop a proposal for a statewide public defense system. In 2016, OSPD's mission expanded to include representing parents in child welfare matters, including parents across the state facing abuse and neglect allegations and potential termination of parental rights, both in trial and on appeal. The Family Defense Division oversees the delivery of legal services to parents in Mississippi; provides technical assistance to defense attorneys, including one-on-one support for attorneys in individual cases; and represents parents in some appeals. In 2024, the Legislature authorized the establishment of a youth defender program, which similarly provides training and technical assistance for youth defenders, and advocates on behalf of youth in the Youth Court system. OSPD has numerous current clients with Youth Court cases involving delinquency, children in need of supervision ("CHINS"), dependency, and termination, and a steady stream of future clients. OSPD relies on access to records to perform its mandated functions, including providing one-on-one technical assistance and conducting trainings.

25.    Plaintiff André de Gruy has been the Mississippi State Public Defender since 2016. He is barred in Mississippi, has statutory authority to represent parents in child welfare cases and children in delinquency and CHINS cases, and general authority to speak for the office on issues related to public defense. Plaintiff de Gruy has dedicated his career to public defense. He founded the Mississippi Office of Capital Defense in July 2001, and served as director of that program until June 1, 2021. He was Director of the Mississippi Capital Defense Resource Center, Inc. and an Assistant Public Defender in Hinds County. He served on the Mississippi Public Defender Association Board of Directors for over fifteen years including as President and Chair of both the Training and Public Policy Committees. He is a member of the National Association for

Public Defense, National Association of Criminal Defense Lawyers, and the Mississippi Association for Justice.

26.    Plaintiff Brenda C. Locke is the Youth Defense Program Director for OSPD, where she provides technical support and training to Youth Court defense attorneys, and direct representation in trial-level delinquency and CHINS cases. Plaintiff Locke also has authority to represent clients in appeals. Plaintiff Locke serves as the State Defender's representative on boards or task forces, and attends meetings related to Youth Court matters and policies. She assesses youth defense needs throughout the state. Plaintiff Locke is admitted to the bar of Mississippi and has dedicated her career to youth defense. She spent nearly fifteen years representing youth charged with delinquent acts in Jackson County, Mississippi. Beginning in 2012, Locke served as the Juvenile Resource Attorney for the Mississippi Office of State Public Defender. In 2024, Plaintiff Locke rejoined OSPD as the Youth Defense Program Director. She is a certified Youth Defender Advocacy Program Trainer and a member of the Gault Center Southern Region Advisory Committee. She currently represents clients in Youth Court and will continue to take new cases, per the Youth Defense Program's mandate. Plaintiff Locke has been denied timely access to her clients' records as a result of Defendant's policies and practices.

27.    Plaintiff Jennifer Morgan is the Family Defense Program Director at OSPD, where she provides technical support and training for other Parent Defenders and works on appeals and select trial matters. Plaintiff Morgan serves as the State Defender's representative on boards and task forces, and attends meetings related to Youth Court matters and policy. Morgan is admitted to the bar in Mississippi and has dedicated her career to family defense. In 2016, she became the full-time parent representation attorney for Desoto County. She continued in that role until she joined OSPD in 2021. Morgan is a certified parent defender and earned her Child Welfare Law Specialist certification in 2019. She has maintained that certification continuously. Upon information and belief, there are at most two other people in the entire state who have this certification, and neither represents parents in Youth Court. Plaintiff Morgan is currently representing parents with open Youth Court cases and will continue to take new cases, per the

7

Program's mandate. Plaintiff Morgan has been denied access to certain crucial records, such as case notes, as a result of Defendant's policies and practices.

28.    Plaintiff A. Arman Miri is a named Partner at Lowrey, Fortner, & Miri, P.A., a private law firm based in Hattiesburg, Mississippi. Mr. Miri represents indigent parents accused of abuse or neglect, parents facing termination of parental rights, and children accused of delinquent acts. Plaintiff Miri currently represents clients in dependency, termination proceedings, and delinquency cases and regularly takes on new Youth Court clients. He is currently being denied full and timely access to Youth Court records, and has clients who are being denied access to records in their own cases, due to Defendant's policies and practices.

29.    Defendant Katharine Surkin is the Director of the Administrative Office of the Courts ("AOC"). She is sued in her official capacity. The AOC was created in 1993 for the purpose of "assist[ing] in the efficient administration of the nonjudicial business of the courts [] and in improving the administration of justice in Mississippi[.]" Miss. Code Ann. § 9-21-1. The Director of the AOC is appointed by and serves at the pleasure of the Mississippi Supreme Court. In 2015, the Supreme Court issued an order requiring Youth Courts to use the Mississippi Youth Court Information Delivery System ("MYCIDS") for filing and docket management and requiring that all records associated with a Youth Court case be stored in MYCIDS.[6] The AOC controls access to MYCIDS.[7] There is no way to obtain access to the state's Youth Court case management system—and the Youth Court records that are required to be filed in that system— without first obtaining a username and password from AOC, which provides the user with access to view or copy records associated with a particular case. Ultimately, AOC is the custodian of

---

[6] Exhibit 2, No. 2015-AD-0001, Serial 196665, *Re: Administrative Orders of the Supreme Court of Mississippi* (May 26, 2015) (requiring Youth Courts to implement MYCIDS, including generating orders, petitions, summons, and notices, using MYCIDS; saving all documents filed in a Youth Court case to MYCIDS; and timely inputting of intake, custody, referral, petition, and hearing data into MYCIDS) ("Supreme Court's Order").

[7] Mississippi Youth Court Information Delivery System Information Disclosure Policy, https://courts.ms.gov/trialcourts/youthcourt/webhelp/MYCIDS%20updated%20Access%20Pol icy.pdf.

Youth Court records and controls physical access to those records. Even if the filing system changes, AOC will continue to have custody and control of Youth Court records and the state's Youth Court case management system.

## IV.    FACTUAL ALLEGATIONS

### A. Mississippi Youth Courts Adjudicate Cases That Implicate the Fundamental Constitutional Rights of Parents and Children.

30.    In Mississippi, cases involving children whose parents are accused of abuse or neglect, or who are themselves accused of delinquent acts or of being a child in need of supervision ("CHINS"), are heard in Youth Court.

31.    In the twenty-four counties that have a County Court, a County Court Judge presides over Youth Court. In some larger counties, there is a judge dedicated to a Youth Court docket. In smaller counties, the sole County Court Judge hears all County Court matters.

32.    In the fifty-eight counties without a County Court, Chancery Court Judges preside over Youth Court. In those jurisdictions, Chancery Court Judges routinely appoint a lawyer in private practice to sit part-time as a Youth Court referee.[8]

33.    County Court Judges and Chancery Judges are elected in non-partisan elections. Referees are unelected.

34.    The delinquency, CHINS, dependency, and termination matters that are heard in Youth Court involve government action that seeks to infringe fundamental liberty interests: either the government seeks to separate a family temporarily or permanently, or the government accuses a youth of a delinquent act and seeks to curtail their liberty.

35.    Youth Court hearings are complex. All parties are entitled to counsel at most stages, and the rules of evidence govern most proceedings. Judicial officers apply a range of discretionary legal standards to the facts and are responsible for considering and resolving factual and legal disputes that implicate the liberty interests of children and parents. Each one of the

---

[8] *See* Counties in Which Youth Courts Are Served by Youth Court Referees (Updated Oct. 28, 2025), https://courts.ms.gov/trialcourts/youthcourt/Referee%20list.pdf.

hearings that occurs within any Youth Court case is adversarial in nature and involves the substantive consideration of evidence, factfinding on disputed questions by a neutral arbiter, application of legal standards and precedent, the interplay of statutory and constitutional law, and the exercise of immense discretion by the judge.

36.     Plaintiffs' clients are particularly vulnerable. They are indigent people whose lives are in turmoil: parents whose children have been taken by the state, or minors who are in crisis, facing detention or other punishments.

37.     Parents and children fear retaliation if they upset the judicial officer presiding over their case. And their fears are reasonable. The Mississippi Supreme Court recently suspended Youth Court Judge Aelicia Thomas, who sits in Bolivar County, for requiring parents to attend a fundraiser in order to be reunited with their children.[9] Youth Court attorneys report that parents who ask questions and request documents are labeled "difficult," and attorneys who file motions or appeals are labeled as "activist attorneys."

38.     On the dependency and termination side of Youth Court, a client who is deemed problematic or a hassle, or an attorney who is labeled an "activist," could have difficulty getting information from CPS about the parent's child, or an order from the court requiring CPS to provide that information. The government may stop responding to the client's attorney, handicapping the attorney's ability to advocate in court. Or the court may be more likely to grant a request by CPS to change the permanency goal from reunification to adoption if the court thinks the parent is difficult. The retaliation is often subtle and informal. It can come from a CPS worker's inaction, the way the worker testifies, the credibility determinations the court makes, and the court's and agencies' willingness to get the client the services they need.

---

[9] *See* Anna Wolfe, *Officials Say a Youth Court Judge Tried to Make Parents Attend a 'Fundraising Event' to Get Their Kids Back. Mississippi's High Court Intervened*, MISSISSIPPI TODAY (Apr. 13, 2026), https://mississippitoday.org/2026/04/13/youth-court-judge-fundraising-event/; *Miss. Comm'n on Jud. Performance v. Thomas*, No. 2026-JP-00402-SCT, 2026 WL 1103129 , at *1 (Sup. Ct. Miss., Apr. 16, 2026) (mem.).

39.     On the delinquency side, retaliation against a "difficult" child or "activist" attorney can come in the form of a judge detaining a child longer than necessary, placing the child on an ankle monitor or keeping them on the monitor, extending probation, continuing hearings, or adding conditions of release.

40.     Plaintiffs Locke, Miri, and Morgan counsel their clients about the risk of retaliation should they talk to anyone about their cases or what happens in Youth Court. Many clients are deterred from doing anything that could even remotely decrease the likelihood that their families can stay together.

41.     The outcomes of these hearings change the trajectory of people's lives, and the impacts of those decisions last for generations. The importance of the rights at stake and the complexity of the hearings require Defendants to afford Plaintiffs' clients with fundamentally fair procedures, consistent with due process.[10]

### 1.  Delinquency Cases

42.     Delinquency and CHINS cases proceed much like criminal cases and impact the fundamental rights of children and their families. A case begins with an allegation of conduct against a minor over the age of ten that, if committed by an adult, would constitute a crime.[11] A finding of delinquency can result in the child's loss of physical liberty and family separation.

43.     Children are accused of delinquent acts and CHINS offenses through a complaint transmitted to the intake unit of the Youth Court, typically by a police officer, a school official, the parents themselves, or a private citizen. The Youth Court's intake unit conducts a preliminary inquiry into the allegations and submits a recommendation to the court about how to proceed. A

---

[10] *Stanley v. Illinois*, 405 U.S. 645, 659 (1972) (requiring notice and a hearing for parents prior to removal of their children); *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982) ("When the state moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."); *In re Gault*, 387 U.S. 1, 30–31 (1967) (holding that delinquency proceedings must comport with due process).

[11] Some of the most serious offenses by children can be filed originally in adult criminal court, and for a child age 13 or older, cases can be transferred from Youth Court to adult criminal court following a transfer hearing. *See, e.g.*, Miss. Code Ann. § 43-21-157.

Youth Court judicial officer then enters an order for there to be no action, an informal adjustment, an informal warning or counseling, referral to an intervention court, or that a formal charging document—a petition—be filed.

44.    If a child is arrested, a judicial officer generally must give oral authorization for custody, and a detention hearing must be held within forty-eight hours, excluding weekends and holidays. Mississippi law also gives police officers an option, under limited circumstances, to take a child into custody without any judicial order, so long as a judge authorizes temporary detention within twenty-four hours of arrest. Miss. Code Ann. § 43-21-303(4).

45.    If a detention hearing is held, the child will be appointed counsel to provide representation at the hearing, and a judicial officer will decide whether the child will be released or detained pending adjudication of the allegations.

46.    The adjudication hearing for a delinquency or CHINS case is similar to a criminal trial. It is a full evidentiary hearing, and the rules of evidence apply. At this hearing, a judicial officer determines whether the state has proved, beyond a reasonable doubt, that the child is delinquent and will enter an order with the court's decision. Most delinquency and CHINS cases result in an admission, which is akin to a guilty plea in criminal court.

47.    If a child is adjudicated delinquent or CHINS, the court will proceed to a disposition hearing, which is similar to a sentencing hearing in criminal court. Judicial officers have broad discretion in reaching a disposition. The judge can order the child released; placed with a parent or other relative; placed on probation; sent to treatment; placed in the custody of the state, which in turn can decide whether to assign the child to a "training school" or a different facility; to participate in a Youth Court work program; placed under house arrest; or sent to a juvenile detention center. The court also can order the child to pay a fine or restitution, suspend the child's driver's license, or require them to register for life as a sex offender. Dispositional options in a CHINS case are similar. All dispositions must be reviewed annually, and the court is permitted to revoke the original disposition and impose any disposition it could have originally ordered.

12

48.    As in criminal court, few issues can be appealed until a disposition is reached. Many orders, including discovery orders, are not clearly subject to interlocutory appeals. As a result, appeals related to the failure to disclose information or records can take years to resolve.

49.    A child in delinquency or CHINS proceedings has a right to effective assistance of court-appointed counsel throughout their case under federal constitutional law and Mississippi law. *In re Gault*, 387 U.S. 1, 36–37 (1967); Miss. Code Ann. § 43-21-201(1)(b).

50.    Many attorneys who represent children in these proceedings are subject to conflicting incentives. For example, youth defense counsel who are contracted, employed, or appointed by the Youth Court functionally work for that judge, and are therefore incentivized to please the judge in order to keep their jobs. These attorneys could be fired if the judicial officer decides they do not like how the attorney practices. As a result, youth defense attorneys are incentivized to represent their clients in ways that avoid jeopardizing their own careers and livelihoods, even if their conduct on behalf of their client is inconsistent with their client's rights and interests. Consistent with these incentives, many youth defense attorneys routinely fail to seek authorization for investigators or experts, do not file motions that they expect would irritate or create more work for the judge, and do not appeal the judge's rulings.

51.    Additionally, judges determine compensation schemes for Youth Court defenders that pit the defense attorneys' financial interests against the clients' interests in liberty or family reunification. For example, judges decide whether to pay attorneys an hourly rate or a fixed fee and also set the hourly rate. Judges also have discretion to approve the retention of experts or investigators and reimbursements relating to their work.

52.    More basically, if a child is not detained prior to adjudication, children routinely do not meet their attorneys until just before the adjudication hearing, which takes place up to ninety days after the petition is filed. Children routinely admit to the allegations that day, negating the opportunity for discovery or motion practice. On information and belief, some children do not get attorneys at all.

53. Records related to a delinquency or CHINS case are generated and must be uploaded to MYCIDS throughout the life of the case, from the moment a report is made.

54. Considered stage-by-stage, these records include, but are not limited to, documents relating to:

a. **An informal adjustment:** A copy of the informal adjustment agreement, which sets out what a child must do to avoid a petition being filed;

b. **A detention hearing:** A police report and/or a minor's complaint, which sets out the allegations; the risk screening tool and score used by a judicial officer deciding whether to detain a child; school records and any other documents offered by the prosecution to argue for pre-adjudication detention; the court order setting out the results of a detention hearing;

c. **A transfer hearing:** The report from a transfer study, used to decide whether a child should be transferred to adult court; psychological evaluation; formal charging document, setting out the charges and the motion to transfer; court order setting out the results of the hearing and any requirements of the child and/or their parents, and—if transfer is granted—setting bond and conditions of release;

d. **Adjudication (whether a full evidentiary hearing or admission):** All discovery materials (including the defendant's statement, witness statements, police reports, delinquent and criminal histories of state's witnesses, lab test reports, notice of and access to exhibits, school records, cell phone records, and social media records); search warrants and returns; expert opinions and the bases for them; drug screen results; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

e. **Disposition:** Social summary and recommendations for disposition generated by the Department of Youth Services; school records; summary of assessment tool findings; restitution documentation; the youth's Youth Court history; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

f. **A modification of disposition hearing:** Copy of the petition alleging violations of the original disposition order; any documents, a list of witnesses, and witness statements; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

g. **A hearing on a violation of a valid court order in a CHINS case where the court is seeking to detain a child found to be CHINS:** Written report from the

Department of Youth Services containing a review of the child's behavior, a determination of the reasons for that behavior, and a determination that all other dispositions other than secure juvenile detention are inappropriate; court order setting out results of the hearing and any requirements of the child and/or their parents;

h. **A review (or post-disposition review) hearing:** Typically a report from whoever is supervising the youth; any other document the prosecution or supervising entity wants to present; a court order; court order setting out results of the hearing and any requirements of the child and/or their parents;

i. **An appeal:** Copies of all orders filed to perfect an appeal; transcript of entire record, including exhibits; copies of briefs, motions, and responses filed in the Supreme Court.

55. The Mississippi Supreme Court requires all of these records and any others related to a delinquency or CHINS case to be filed in MYCIDS, which is the Youth Court case management system. AOC controls access to MYCIDS and routinely fails to provide Plaintiffs, other youth defense attorneys, and parents and children involved in Youth Court cases with full and timely access to their Youth Court records.

56. As of July 1, 2026, AOC will be prohibited from providing access to any of these records to Plaintiffs, any other youth defense attorney, or to any parent or child involved in a delinquency or CHINS case. On information and belief, AOC will continue to control access to records in the state's Youth Court case management system, even if a new system replaces MYCIDS.

57. Children in Youth Court cases are always denied access to their records, unless their attorney has access and chooses to show the child the records.

### 2. Proceedings Involving Abuse, Neglect, and Termination of Parental Rights

58. In addition to delinquency matters, judicial officers in Youth Court oversee proceedings against parents accused of abuse or neglect, and whose parental rights the state seeks to terminate.

59. These cases impact parents' fundamental liberty interest in the "care, custody, and

control of their children,"[12] and children's reciprocal right to family integrity. Dependency proceedings also implicate a broad range of other important constitutional interests, including rights against government surveillance, rights against search and seizure, the right to associate with extended family and one's community, and the right to associate with siblings. Courts refer to the termination of parental rights as the "civil death penalty,"[13] in recognition of the fact that terminating parental rights is "an exercise of awesome power" that completely and irrevocably extinguishes a parent's fundamental liberty interest in raising their child.[14]

60.    As with delinquency and CHINS cases, a dependency case proceeds much like a criminal case. It begins with a report of wrongdoing, which can come from anyone. The intake unit of the Youth Court conducts an initial screening. If the report is screened-in, it will be sent to Child Protective Services ("CPS") for investigation. CPS submits its initial findings and a final investigation to the Youth Court judicial officer who generates an intake order based on CPS's report. The court's order can instruct the prosecutor to file a petition, CPS to monitor the family, or for there to be no action taken. If the court instructed the prosecutor to file a petition, then the prosecutor does so. The petition functions like a criminal complaint in that the petition is the initiating document for the case and sets forth the allegations related to why the child is abused or neglected.

---

[12] *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (same).

[13] *See, e.g., K.H. v. Limestone Cnty. Dep't of Hum. Res.*, 361 So. 3d 770, 772 (Ala. Civ. App. 2022) (noting, "termination of parental rights – an extreme remedy that has been described, at various times, as being draconian and equivalent to a civil death penalty."); *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. 2004) (observing, "termination of parental rights has been characterized as tantamount to the 'civil death penalty.'"); *In re Parental Rights A.L.*, 130 Nev. 914, 918 (2014) (noting, "terminating parental rights 'is an exercise of awesome power' that is 'tantamount to the imposition of a civil death penalty.'" (quoting *In re Parental Rights A.J.G.*, 122 Nev. 1418, 1423 (2006)); *In Int. of A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (noting, "[t]ermination of parental rights has rightly been called the civil death penalty."); *Stann v. Levine*, 636 S.E.2d 214, 220 n.9 (N.C. Ct. App. 2006) (citation omitted).

[14] *Smith v. Smith*, 720 P.2d 1219, 1220 (Nev. 1986), *overruled on other grounds by In re of Termination of Parental Rights as to N.J.*, 8 P.3d 126, 132 n. 4 (Nev. 2000).

61. Generally, the government may not seize a child unless it has obtained written or oral permission from a judicial officer. If the order is given orally, it must be reduced to writing within 48 hours. However, in certain narrow circumstances, the state is permitted to seize a child without any judicial order, so long as a judicial officer authorizes detention within 24 hours of removal. Miss. Code Ann. § 43-21-303(4).

62. The shelter hearing is typically the first hearing in a dependency case.

63. Parents are entitled to counsel at the shelter hearing.

64. However, courts routinely fail to advise parents of their right to counsel, and also routinely fail to appoint counsel if a parent does not request counsel. Even if a parent requests counsel, many counties lack any family defense attorneys, and courts tell parents they cannot have an attorney because they do not have anyone to appoint. Parents are also informed that it may take longer to be reunited with their children if they insist on counsel. On information and belief, courts routinely fail to inform parents that they can call OSPD to represent them.

65. As a result, it is possible that parents will not have any counsel at all unless and until there is a trial on a petition for termination of parental rights.

66. On information and belief, there are scores of pending dependency and termination cases that do not have any lawyer associated with the parent, despite parents' right to counsel.

67. Moreover, as with attorneys representing children involved in delinquency and CHINS cases, many attorneys representing parents in dependency and termination proceedings are subject to conflicting incentives. They are hired and fired by the judicial officers in whose courts they earn their living, and are therefore incentivized to please the judge, even at the expense of their clients' interests. They also are subject to court-created payment schemes that pit their personal financial interests against their clients' interests.

68. Judicial officers' decisions impact parents' and children's fundamental liberty interests throughout the case. At the shelter hearing, a judge decides whether the state lawfully can take a child into custody. Next is the pre-adjudication hearing, during which the parties are permitted to litigate pre-trial motions and discovery requests. The judge may reassess where and

with whom the child lives and a parent's visitation right. The adjudication trial follows. This is a formal trial on the merits of the state's allegations. Formal rules of evidence apply, and the state is supposed to prove its allegations by a preponderance of the evidence. If the judge makes a finding of neglect or abuse, the judge typically issues an order stating that the child is found to be abused or neglected. A party to the proceeding may request a written opinion setting out conclusions of law and findings of fact, explaining the reasons for the decision.

69.     The disposition trial follows. This trial is analogous to a sentencing hearing. The judge is required to consider evidence of the child's "best interests" and decide what will happen next for the family, including whether the child will be kept separated from their family and under what conditions reunification can occur.

70.     After the disposition trial, if a child remains in state custody, the court must hold regular permanency planning hearings to evaluate the child's and family's circumstances. At these hearings, the court considers the "best interests" of the child and makes findings about which services have been and should be offered and whether the child's placement is appropriate. If a parent and child are not reunified, the Youth Court will issue an order requiring the government to file a petition to terminate parental rights.

71.     Termination hearings result in both an adjudication and a disposition. At the conclusion of a termination hearing, the judge must issue a written order explaining whether the state has proven, by clear and convincing evidence, one of the statutory grounds for termination and that termination is in the child's "best interest."

72.     Records related to a dependency or termination case are generated and must be uploaded to MYCIDS throughout the life of the case.

73.     Considered stage-by-stage, these records include, but are not limited to, the following:

   a. **Intake:** A Court Case Information Form that sets out basic information about the family and the allegations against the parent(s); any documents related to cases where a child is not removed and no attorney is assigned, including in-home cases, informal adjustments, and safety plans;

b. **Shelter hearing:** The emergency custody order authorizing seizure of a child; a shelter hearing court report from CPS; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

c. **Adjudication (whether a full evidentiary hearing or admission):** Documents reflecting CPS's investigation and findings; all discovery materials (including witness statements, exhibits, school records, cell phone records, and social media records); CPS's adjudication court report, which typically includes the allegations, a family history, a summary of the family's identified needs, a summary of CPS's investigation, and CPS's recommendations for the permanency plan and the parent's tasks and goals; search warrants and returns; expert opinions and the bases for them; drug screen results; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

d. **Disposition:** CPS's court summary, adding recommendations for tasks and goals for the family on top of the requirements from the adjudication court summary and adjudication court order; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

e. **Permanency Hearings:** CPS's court summary along with any documentation that CPS has gathered relating to the child's health and safety, and any information about parents' progress on tasks or goals; court order setting out results of the hearing and any requirements of the child and/or their parents, and possibly including findings of fact and conclusions of law;

f. **Foster care review:** Youth Court Hearing and Review Summary;

g. **Termination of parental rights:** The entire case file for the underlying dependency case, which is assigned a different cause number; discovery; court order setting out results of the hearing and possibly including findings of fact and conclusions of law;

h. **An appeal:** Copies of all Orders filed to perfect an appeal; transcript of entire record, including exhibits; copies of briefs, motions, and responses filed in the Supreme Court.

74. The Mississippi Supreme Court requires all of these records and any others related to a dependency or termination case to be filed in MYCIDS. Defendant controls access to MYCIDS and routinely fails to provide Plaintiffs, other family defense attorneys, and parents involved in Youth Court cases with access to their case records. As of July 1, 2026, Defendant

will be prohibited from providing access to any of these records to Plaintiffs, any other family defense attorney, or to any parent involved in a dependency or termination case.

**B. Section 43-21-261(24) Will Further Reduce Youth Court Attorneys' and Their Clients' Already Unconstitutionally Limited Access to Records and Information, Prejudicing Them Further in Legal Proceedings That Impact Fundamental Rights.**

**1. Current Practices Are Unduly Restrictive.**

75.     Under Mississippi law, files and records related to any proceedings in Youth Court, are strictly confidential, *see* Miss. Code Ann. §§ 43-21-251–43-21-265, subject only to certain statutory exceptions set forth in § 43-21-261.

76.     Those exceptions authorize AOC to give Plaintiffs, other Youth Court attorneys, and their clients access to the records and information that are necessary for attorneys to do their jobs and for their clients to receive basic procedural due process. They also permit Defendant to disclose Youth Court records to service providers, foster placements, schools, and medical and mental health care providers.

77.     Any unauthorized disclosure of confidential material is punishable by civil contempt and criminal prosecution. Miss. Code Ann. § 43-21-267. Judges and prosecutors routinely threaten Plaintiffs and their clients that if they say anything about what happens in Youth Court or share records, they could be criminally charged or held in civil contempt. Officials with Child Protective Services ("CPS") and the Department of Human Resources ("DHS") threaten to report any unauthorized disclosure by Plaintiffs or their clients to the court. Plaintiffs and most other Youth Court defense attorneys advise their clients not to talk about their cases, share their records, or even mention their involvement with CPS or DHS to avoid jailing, a fine, contempt, or any kind of formal or informal retaliation.

78.     Mississippi's confidentiality scheme, and especially the criminal penalties for violating it, silences parents and children. It prevents them from seeking support during some of the most traumatic moments of their lives because they fear prosecution or that they will never be reunited with their children. It also prevents them from identifying witnesses and evidence

20

that could be important for their defense, and sometimes chills defense lawyers from seeking technical assistance from OSPD, Plaintiff Morgan, and/or Plaintiff Locke.

79.    Defendant's current policy and practice is to deny MYCIDS access to any Youth Court attorney and all parents and children with Youth Court cases, absent a court order, even though the statute does not require a court order.

80.    Under current practices, when a parent or child, through counsel or on their own, requests access to certain records or information related to their own case, judicial officers exercise broad discretion to decide whether and what to share. Judicial officers routinely exercise their discretion to delay access or deny access entirely to children, parents, and attorneys involved in Youth Court cases.[15]

81.    Without a Youth Court order requiring AOC to grant access to MYCIDS, children, parents, and their attorneys typically cannot access any records for their cases.

82.    Sometimes a judicial officer will issue an order authorizing disclosure of one part of the record. In those cases, Defendant's policy and practice is to refuse to issue a username and password, thus barring *all* access, because it is not possible to provide access to only part of the record on MYCIDS. The person could try to obtain paper copies of the portions of the record that were ordered disclosed from the clerk's office, but many clerks' offices maintain files only on MYCIDS, per the Supreme Court's Order. In those cases, login information from the AOC is the only way to access the records covered by the court order, and AOC will not grant access.

83.    AOC has denied or delayed Plaintiffs, other Youth Court attorneys, and parents and children with Youth Court cases access to MYCIDS entirely or in part. Without access, attorneys representing parents or children not only lack access to any and all records associated with their cases, they also do not know when something is filed, when an order is issued, when a deadline is set, or when a hearing is scheduled.

---

[15] Members of the public certainly cannot obtain records from the proceedings—even with redactions or other safeguards to protect the identities of those involved in the proceedings.

## 2. On July 1, Defendant's Patchwork, Discretionary Denials of Access Will Become Uniform and Mandatory.

84. On July 1, 2026, the system's secrecy will become even more extreme because the discretionary and patchwork decisions judicial officers make and Defendant enforces to deny or delay access to Plaintiffs and their clients will become mandatory and uniform.

85. On July 1, 2026, the exceptions in § 261 will be automatically repealed, and there will be no exceptions to the mandatory confidentiality provisions in the Mississippi code. AOC, Youth Court judicial officers, CPS, and DHS have stated publicly and privately that they will consider themselves to be barred from providing records or information to *anyone*, including Plaintiffs, other Youth Court attorneys, and all parents and children with open cases.

86. Across the entire state, parents who are bound by Youth Court orders involving their children will not have access to those orders. CPS will not be able to provide records and information about children in CPS custody to health insurance providers like Medicaid, children's advocacy centers, medical and mental health providers, schools, foster parents, relatives offering support, and even the Youth Court. And CPS may not be able to draw down federal funding because it will not be able to provide the files and information required for auditing purposes.

## C. Current Practices Cause Irreparable Harm to Plaintiffs and Their Clients and the Implementation of Subsection 24 Will Exacerbate That Harm.

87. Youth Court attorneys have a legal and ethical obligation to represent their clients competently.

88. If subsection 24 goes into effect, Plaintiffs and other Youth Court attorneys will be categorically denied access to Youth Court records, and it will be impossible for them to meet the basic standards of practice that are required by state and federal law—particularly in cases where Plaintiffs and their clients are denied complete access to records.

89. Mississippi law requires all attorneys in Youth Court to provide "competent representation to the party client pursuant to the Mississippi Rules of Professional Conduct." Miss. Code Ann. § 43-21-201(4). Rule 1.1 of the Rules of Professional Conduct requires

attorneys to ensure "preparation reasonably necessary for the representation." Miss. Rules of Pro. Conduct R. 1.1. Without case files and information, attorneys cannot prepare at all. Further, Rule 1.4 requires lawyers to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *Id.*, R. 1.4. Plaintiffs cannot explain anything to their clients if they do not have records and information so that they themselves can understand the case.

90.    Without information about CPS's investigation, allegations, and evidence against their clients, Plaintiffs cannot provide effective representation. They are unable to prepare effectively for hearings. They cannot counsel their clients on their options, prepare a litigation strategy, assess factual disputes, conduct a meaningful investigation, hire relevant experts, or otherwise provide competent representation to their clients consistent with basic ethical rules of professional responsibility.

91.    Plaintiffs require records and information to function as Youth Court lawyers. To take a few specific examples, a parent and their attorney must be able to review a petition in dependency court so they can contest the bases for removal. Plaintiffs and their clients need access to forensic reports so they can fully understand the government's arguments for removal, separation, or termination, identify expert witnesses, and conduct other investigation. Access to the underlying dependency case file is necessary to defend a parent in a termination trial. In delinquency proceedings, a youth defense attorney needs access to a transfer study so they can build a persuasive case against a motion to transfer the child to the adult system. Access to information about clients' prior involvement with Youth Court is necessary so Plaintiffs can identify potentially exculpatory evidence and fully understand their clients' situations. And without access to case files, orders, and the trial record, attorneys and their clients in any Youth Court case cannot perfect or file an appeal.

92.    Similarly, parents and children must be able to review court orders to be sure they are complying with the court's requirements, and Youth Court attorneys need access to them to appropriately counsel their clients about how to comply. If the court order shows that a case is

closed in the parent's favor, a parent needs a copy of that order to prove to schools, doctors, and others that the natural parent has full rights to the child.

93.    Without access to records, case files, and information about ongoing cases, parents and children are completely in the dark about why the government is trying to destroy their family or lock up a child, and the attorneys standing next to them function as little more than lay companions, stripped of any meaningful ability to apply their expertise and experience to oppose the full weight of the Mississippi government bearing down on their clients' fundamental rights.

94.    On July 1, 2026, Plaintiffs and every other Youth Court attorney will be effectively foreclosed from practicing law.

95.    As of July 1, it will be impossible for parents and children to receive adequate notice or to have fair hearings in legal cases impacting fundamental liberty interests, like a parent's right to raise their child, a child's reciprocal right to be raised by their natural parents, and a child's right to be free from state custody, whether as a dependent or delinquent child.

96.    On July 1, OSPD as an entity will also be harmed. It will be unable to fulfill key parts of its statutory mandate, including providing training and one-on-one technical support. There will be little point to OSPD's Family Defense and Youth Defense Programs if all the Youth Court attorneys these programs are meant to hire, train, and advise cannot do their jobs. OSPD will be unlikely to continue paying contract attorneys if those contract attorneys are unable to provide meaningful representation to clients. OSPD also will not be able to represent clients on appeal if the agency cannot obtain the trial record and transcripts.

97.    Additionally, OSPD's Interdisciplinary Parent Defense Teams will be unable to do their work. The Interdisciplinary Defense Team ("IDT") is composed of a family defense attorney, a parent social work advocate, and a parent partner, who is a person with lived experience in the system. The model depends on information sharing between CPS, the attorney, the social worker, the parent partner, and the parent. If CPS is unable to share any information with the IDT, the parent partner and social worker will not be able to support the parents in finding services or otherwise support the parent's defense.

24

98.    Moreover, OSPD received a grant from Casey Family Programs specifically to run this program. It is unclear whether that grant would be rescinded if the program cannot function. Without this grant money from Casey Family Programs, on information and belief, OSPD may need to lay off several employees.

### D. Enjoining Subsection 24 Serves the Public Interest and Will Not Harm Defendants.

99.    Across the country, court systems that decide cases involving children provide all parties and their lawyers with essential and basic access to records and information relating to those cases, so that attorneys who represent clients in these proceedings can contest the state's allegations, which—if proven—could lead to a child's jailing and the legal end of a family unit. Due process and accurate judicial decision-making require at least this much.

100.    There is no evidence that harm has resulted from requiring the free exchange of information, records, case files, and evidence sufficiently in advance of a hearing that counsel and their clients can make use of them.

101.    The risk of error in a proceeding where one party has an ineffective lawyer and no access to records and information about the state's allegations and the evidence the government intends to use to prove its case is extreme and intolerable in a democratic society. It would be like conducting a criminal trial without providing the defense with the indictment or the state's evidence, or sentencing a criminal defendant without providing the defense with a pre-sentencing report.

102.    There is no governmental interest at all in removing a child from a fit parent, terminating a parent's rights when it is not in the child's best interests, or locking up a child unnecessarily. Plaintiffs and their clients must be able to fairly test the government's case to ensure decisions infringing these rights are accurate, and that is possible only if the underlying records and information are shared with them.

103.    When Plaintiffs are prohibited from accessing the evidentiary basis for the government's factual assertions and legal arguments, it is impossible for them to function as lawyers, and the hearings themselves fall far short of what due process requires.

104.    State and local officials across Mississippi have publicly and privately expressed dismay at the imminent, catastrophic effects on children, parents, families, and the Youth Court system as a whole if subsection (24) goes into effect. That same harm occurs every day in Mississippi when Youth Court attorneys and their clients are denied their basic right to records in their own cases.

## V.    CLASS ALLEGATIONS

105.    This action is properly maintained as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

106.    The proposed Youth Court Attorney Class is represented by Plaintiffs Brenda Locke, Jennifer Morgan, and A. Arman Miri, and is defined as "all attorneys who currently represent or will represent clients in Youth Court cases in Mississippi."

107.    The Class meets all of the requirements of Federal Rule of Civil Procedure 23(a).

108.    The Class is sufficiently numerous to make joinder impracticable. There are over one hundred (100) attorneys across the state who meet the statutory training requirements to represent clients in Youth Court. Although it is impossible to know the exact number of attorneys who practice in Youth Court or to identify all attorneys with active Youth Court cases at any given time because Youth Courts in Mississippi are closed to the public and there is no public roster of attorneys who take Youth Court cases, Defendant has access to the identity and number of attorneys with open cases in Youth Court. New attorneys regularly complete the training and decide to start taking Youth Court cases, while others are losing their certification and/or decide not to take Youth Court cases.

109.    The questions of fact and law raised by Plaintiffs' claims are common to and typical of those of each putative member of the Classes they seek to represent.

110.    Questions of fact common to the Class include: (a) Whether Youth Court records are accessible on a case management system that AOC manages; (b) Whether AOC has the technical ability to provide access to Youth Court records to Plaintiffs and their clients; (c) Whether AOC refuses to provide access to Youth Court records to Youth Court attorneys and their clients; and (d) Whether attorneys can comply with the Mississippi Rules of Professional Conduct and other ethical and legal obligations without records.

111.    Questions of law common to the Class include: (a) Whether procedural due process requires parents, children, and their attorneys in Youth Court proceedings to have access to their records, including written notice of the allegations against them, court orders, and the state's evidence; (b) Whether attorneys can provide effective assistance of counsel without case records; and (c) Whether substantive due process protects Youth Court lawyers' right to practice their profession competently and ethically.

112.    The violations of law and resulting harms, or risks of harms, presented by the named Plaintiffs are typical of the legal violations and harms, or risk of harms, experienced by all Plaintiffs in the Class.

113.    The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff Class, and will adequately and fairly protect the interests of all members of the Classes. The interests of the Class representatives are consistent with those of the Class members.

114.    The named Plaintiffs are represented by experienced counsel who have expertise in class action and civil rights litigation generally, as well as in Youth Court issues and court transparency specifically. Counsel for the Plaintiffs know of no conflicts among members of the Class or between the attorneys and members of the Class.

115.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Classes through trial and any appeals.

116.    Defendant Surkin has acted or failed to act on grounds generally applicable to all members of the Classes, necessitating classwide declaratory and injunctive relief.

## VI.    CLAIMS FOR RELIEF

### COUNT 1

**SURKIN VIOLATES THE PROCEDURAL DUE PROCESS RIGHTS OF PARENTS AND CHILDREN IN YOUTH COURT BY DENYING THEM AND THEIR LAWYERS ACCESS TO YOUTH COURT CASE RECORDS**

117.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1–116 as if fully set forth herein.

118.    Fundamental liberty interests are at stake in Youth Court. Before the government can infringe on these important interests, it must provide fundamentally fair procedures. Among the procedural rights to which Plaintiffs' clients are entitled is the right to the records and information supporting the government's allegations, the disposition the government seeks, the court's decision and reasons, any evidence and information relied on in reaching it, court orders, and transcripts. Basic principles of procedural due process require that records and information be provided both to any party to a Youth Court case and their counsel.

119.    Parents and children in Youth Court have no adequate remedy at law to prevent Defendant's constitutional violations. They are suffering, and will continue to suffer, irreparable harm as a result of Defendant's violations of their rights.

120.    Declaratory and injunctive relief is required to prevent Defendant from further depriving parents and children in Youth Court of their procedural due process rights.

### COUNT 2

**SURKIN VIOLATES YOUTH COURT ATTORNEYS' SUBSTANTIVE DUE PROCESS RIGHTS BY DENYING THEM ACCESS TO YOUTH COURT RECORDS**

121.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1–120 as if fully set forth herein.

122.    The Fourteenth Amendment Substantive Due Process Clause protects a person's freedom to choose and pursue a career. When Defendant denies Plaintiffs access to records in

28

cases in which they are counsel of record, Plaintiffs are effectively foreclosed from practicing their chosen profession, in violation of their right to occupational liberty.

123.    Plaintiffs have no adequate remedy at law to prevent Defendant's imminent constitutional violations. They are suffering, and will continue to suffer, irreparable harm as a result of Defendant's violations of their rights.

124.    Plaintiffs are therefore entitled to declaratory and injunctive relief to prevent further deprivation of their right to occupational liberty.

## VII.    PRAYER FOR RELIEF

WHEREFORE, upon all allegations and counts alleged herein, Plaintiffs respectfully request that this Court:

A.    Enter an order that the Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Enter judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure declaring unconstitutional and unlawful Defendant's policy and practice of denying Youth Court attorneys, and parents and children involved in Youth Court cases, access to case files in its possession;

C.    Provide appropriate equitable and injunctive relief to remedy Defendant's unconstitutional policy and practice of denying Plaintiffs and their clients' access to Youth Court case files, including:

    a.    A temporary restraining order and preliminary injunction requiring Defendant to provide the Plaintiff Class and their Youth Court clients with access to Youth Court records—including, but not limited to, court orders, petitions, summonses, notices, all documents filed in a Youth Court case, and all intake, custody, referral, petition, and hearing data related to a youth, his or her family, and the Youth Court's involvement with the same—in AOC's custody or control, consistent with AOC's practices prior to July 1, 2026.

b. A permanent injunction requiring Defendant to provide the Plaintiff Class and their Youth Court clients with access to Youth Court records—including, but not limited to, court orders, petitions, summonses, notices, all documents filed in a Youth Court case, and all intake, custody, referral, petition, and hearing data related to a youth, his or her family, and the Youth Court's involvement with the same—in AOC's custody or control.

c. A permanent injunction requiring Defendant to provide OSPD with administrative access to case files;

D. Award Plaintiffs and members of the Class other and further relief as the Court deems just and equitable;

E. Award Class counsel reasonable expenses and costs of litigation;

F. Award Class counsel reasonable attorney's fees; and

G. Issue such other relief as the Court deems just and proper.

Dated: June 24, 2026                    Respectfully Submitted,

GRAHAM P. CARNER (MS Bar 101523)
SPENCER CASH (MS Bar 106792)
Carner & Rosemon, PLLC
401 East Capitol Street, Suite 218
Jackson, MS 39201
601-427-8999 (ph)
769-233-8941 (fax)
graham@carnerrosemon.com
spencer@carnerrosemon.com

ELIZABETH ROSSI (*pro hac vice* application forthcoming) (D.C. Bar 1500502)
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
410-935-3758 (ph)
202-410-8938 (fax)
elizabeth@civilrightscorps.org

JAQUELINE ARANDA OSORNO (*pro hac vice* application forthcoming)
ANA BUILES (*pro hac vice* application forthcoming)
Public Justice
1620 L Street NW, Suite 630
Washington, DC
jaosorno@publicjustice.net
abuiles@publicjustice.net

31